FRED W. JONES, Jr., Judge.
Walter Lesniewski, Jr., was severely injured when his Mercury Marquis ran into the rear of a Halliburton Company pickup truck stopped in the center of westbound Interstate Highway 20. The pickup, driven by James E. Tew, Sr., stopped because the lane was blocked by a 2' x 4' X 16' doghouse walk-around stand that had fallen from a Fowler Trucking Company (“Fowler”) truck operated by James H. Dibler. After a directed verdict absolving Tew and Halliburton of liability, a jury found Les-niewski 40% negligent and Fowler and Dibler 60% negligent. Damages were set at $1,700,000.00. Defendants appealed, urging that plaintiff was the sole legal cause of the accident. Plaintiff answered the appeal, asserting that the damages awarded were less than the proven special damages and seeking an increase reflecting both special damages and general damages. We affirm for the following reasons.
At 7:00 A.M. on Saturday, August 15, 1981, James H. Dibler, a truck driver for Fowler, arrived in Camfield, Arkansas in his 10-ton 18-wheeler winch truck to load an oil rig. As the rig was torn down, the pieces were placed on Fowler’s truck. Buster Staggs, also an employee of Fowler, supervised the loading operation. From noon to 2:00 P.M. Dibler’s truck was loaded with a “pony structure” consisting of two layers of mats and two dog-house walk-around stands. Dibler, Staggs and a “swamper” loaded the truck and secured the load with chains.
Before leaving Camfield, Dibler asked Staggs if the load was too high, because it looked that way to him. Staggs was in charge of routing the trucks and getting permits for oversized loads. Staggs told Dibler the load was not too high and instructed him to drive it. Dibler complied and drove south toward Bossier City on Highway 3.
Three miles north of Bossier City, Dibler pulled over “to clamp down the chains and boomers.” David Ryals, then an employee of Trans-Continental Drilling Company and a longtime friend of Dibler’s, stopped to assist him. Dibler told Ryals that the load was stacked too high. Ryals offered to drive with Dibler “to help guide him under the underpasses.”
Ryals testified that they entered 1-20 in Bossier City and headed west. They moved slowly under the first few overpasses and had adequate clearance. They then increased speed and moved to the center lane with Ryals in the lead. As Dibler went under the Pierre Avenue overpass, the top of the load struck the overpass, the chains came loose and the top dog-house stand fell into the center lane.
Stephen Payton, a Halliburton employee in a cement pumper truck, narrowly missed hitting the load by steering into the left lane where he nearly collided with another vehicle.[1] James Tew and Prentiss Carpenter, both Halliburton employees, were following Payton when he suddenly changed lanes. Unable to change lanes in the medium to heavy 4:30 P.M. traffic, Tew brought his company pickup to a controlled stop, without skidding, about 15-20 feet behind the obstruction. He placed the transmission in “park” and turned on his four-way flashers to wait for a break in traffic.
Meanwhile, Dibler crossed from the center lane to the right lane and onto the shoulder. He put on his tractor brakes and his trailer brakes, turned on his four-way *918 flashers, and exited the cab to unhook the trailer.[2] The purpose of this was to free the winch for use in moving the load from the highway. As he was disconnecting the trailer, Dibler noticed the Halliburton pickup stopped behind the dog-house stand in the center lane.
While Dibler was working on the trailer, Ryals made his way onto the shoulder and backed up to within 40 or 50 feet of Dibler’s truck. Ryals got out and retrieved the chains that were in the road. After speaking to Dibler, who was lowering the stands under the trailer, Ryals started to walk to his car.
During this time, Tew was anxiously searching his rearview mirror for a break in traffic, planning to move his truck before getting hit. Suddenly he saw a white car swing from the right lane into the center lane only 100-150 feet away from the back of his truck. Tew and Carpenter grabbed their necks and prepared for the impact. Tew placed both feet on his brake pedal and saw the driver of the car throw his arm before his face just before the car hit the truck. Ryals and Dibler heard but did not see the crash.
Tew called his dispatcher over the two-way radio in his truck and reported the accident. He then got out and started to flag traffic with his baseball cap. An ambulance arrived first and personnel went straight to work on Lesniewski. Second to come was Shelton Scott, a Shreveport policeman dispatched to investigate the accident. Finally, Lawrence Newton, an accident investigator for Halliburton, arrived
The ambulance attendants found Les-neiwski semi-conscious with fractured ribs and bleeding facial lacerations. They placed him on a spine board, put him in the ambulance, and headed for LSU Medical Center. On the way to LSU, Lesniewski stopped breathing and his blood pressure went to 0/0. The ambulance attendant administered CPR until they arrived at LSU some three to five minutes later. Lesniew-ski was immediately taken to the emergency trauma room where a team of physicians and nurses headed by Dr. Marshall Cunningham started emergency resuscitation procedures.
Dr. Cunningham testified that Lesniew-ski arrived Code 99, or without vital signs. The first step toward resuscitation was to insert a catheter into the subclavian vein and thereby introduce fluids directly to the heart. While inserting the catheter, the standard procedure is to take a blood sample and send it to the laboratory. This sample was labeled with only a number in this case since Lesniewski’s identity was not immediately known.
The medical technologist in the LSU Medical Center clinical laboratory received a sample labeled with Lesniewski’s number and ran the standard blood chemistry tests[3] on it, using a Dupont Automated Clinical Analyzer (ACA).[4] She determined that the blood serum alcohol level was 291.2 mg per deciliter.[5] This information was relayed to the physicians in the emergency room who used it in determining the proper treatment of the patient. The sole evidence of the blood serum alcohol level result was in the hospital record which was admitted pursuant to La.R.S. 13:3714.[6]
*919 The emergency room team was able to restore Lesniewski’s vital signs. After becoming stable he was transferred to the VA Hospital, where he remained for some six weeks. The diagnosis was “irreversible brain damage.” At the conclusion of his hospitalization Lesniewski was removed to a nursing home. When his condition regressed, he was taken to the home of his son, where he has remained.
Walter Lesniewski’s condition was described by Dr. Paul D. Ware as spastic quadri-paresis secondary to a closed head injury and secondary to post-traumatic ce-phalopathy with aphasia and chronic brain syndrome. He is not paralyzed but is unable to walk or feed himself. He follows objects with his eyes and can communicate with facial expressions but cannot speak.

Comparative Negligence

Defendants argue that Lesniewski should have been found totally at fault, i.e., assigned 100% negligent. While conceding violation of La.R.S. 32:381 in carrying a load higher than that permitted by statute, they assert that Lesniewski was the sole proximate cause of the accident. We find that the jury was not clearly wrong in assigning 60% negligence to defendants and 40% to Lesniewski.
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), the Louisiana Supreme Court enumerated some of the factors to be considered in assessing the nature of the conduct of the parties:
“(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.”
The Supreme Court also cited Section 2(b) of the Uniform Comparative Fault Act (as revised in 1979) with approval. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
The conduct of the defendants was chosen with opportunity for cool reflection. Fowler’s supervisor was warned that the load was high, yet he sent the truck on without acquiring a permit. No emergency situation required the truck to leave immediately. The driver knew the load was too high and tried to adjust it. The driver decided to risk taking the interstate even though he knew it meant driving under underpasses. Despite the fact that there were numerous avenues available whereby Fowler and its driver could have avoided hitting a bridge and dropping a load which would obstruct traffic, they chose the most convenient and dangerous path. This egregious conduct was a direct cause of the accident.
The conduct of Walter Lesniewski was without opportunity for cool reflection. He was traveling in heavy traffic when he came upon an entrance ramp. Like many reasonable motorists, he changed lanes to the left, allowing room for merging vehicles. Whether he failed to see the stopped truck because he was watching traffic behind him in his rearview mirror as he changed lanes, or failed to discern that the truck was not moving, or just failed to keep a clear lookout is not determinable, since he could not testify. However, what is clear is that Lesniewski made a split-second wrong decision which he did not have time to correct.
How great a role alcohol played in this accident is hotly disputed. There were witnesses who did not smell alcohol in the car and there were those who did. There was a witness who saw Lesniewski approximately one hour before the accident who said he was not drunk or drinking. No alcoholic beverage containers were found in the car. The blood alcohol level of .233 was extrapolated from a blood serum alcohol level result that was questionable. The jury had an opportunity to hear the evi *920 dence and assess the credibility of the witnesses on this issue.
Considering the conduct of the parties and the causal relation that conduct has to the damages claimed, we cannot say that the jury was clearly wrong in finding the defendants 60% at fault and Lesniewski 40% at fault. We therefore turn to a consideration of the damage award.

Damages

At first blush it appears that the jury chose to award Lesniewski only his special damages. However, to make such a finding would require us to find that the jury ignored the arguments of counsel and the clear and unequivocal instructions of the trial judge. Furthermore, a review of the record reveals that much of plaintiffs special damage claims could have been reasonably disallowed by the jury.
Plaintiff sought $80,000 for a sophisticated bed recently developed for prevention of bed sores. Plaintiff asked $234,000 for rehabilitation by a special hospital in Houston, based on highly speculative testimony. Plaintiff requested $108,000 in lost wages but Lesniewski was often unemployed. Plaintiff itemized $990,099 for 22 hours a day of nurse care, $18,360 for registered nurse care, and $228,636 for practical nurse care, without any evidence offered as to the type of care he was currently receiving or the necessity for round-the-clock care.
The jury had the opportunity to weigh the credibility of plaintiffs witnesses and had the opportunity to see Mr. Les-niewski and a film about a typical day in his life. After reviewing the record, we cannot say that an award of $1,700,000 was an abuse of the jury’s discretion in compensating Lesniewski for both his general and special damages.
For the foregoing reasons, we affirm the trial court judgment, with costs of appeal assessed to appellants.

. There is some evidence that there may have been a white car between the Fowler truck and the cement pumper that also avoided hitting the load. The preponderance of the evidence was that there was no such car, but the result would not be changed if it was there.

. The distance from the load to where Dibler parked is unclear but was in the range of 30-60 yards.

. Electrolytes (sodium, potassium, chloride), C02, Glucose, BUN, Creatinine, and ETOH (ethanol, i.e., grain alcohol).

. The Dupont ACA has a 37% cross reactivity with isopropyl alcohol (rubbing alcohol). Serious question was raised at trial about possible contamination of the sample since the chain of possession was not shown. The trial judge decided to allow the possible contamination of the sample to go to the weight of the evidence rather than the admissibility. This issue was not raised on appeal.

. Dr. Helmut Max Redetski, a professor of Pharmacology and Therapeutics and a pioneer in testing for alcohol in the human body, testified that 291.2 mg per deciliter blood serum alcohol translates to approximately .233 g/% blood alcohol.

. Admissibility of a blood alcohol level solely because of its inclusion in a hospital record was not argued on appeal. See FN 4.